FRANK R. DIPIETRO VS. SIPEX CORPORATION.

No. 06-P-758.

Middlesex. December 12, 2006. - May 14, 2007.

Present: LENK, ARMSTRONG, & MILLS, JJ.

*Contract,* Performance and breach, Employment. *Employment,* Termination. *Negotiable Instruments,* Note. *Fraud. Evidence,* Fraud. *Estoppel.*

A Superior Court judge erred in granting summary judgment to the defendant employer with respect to the plaintiff's breach of contract claim based on his written employment agreement, where there was a dispute of material fact whether the defendant terminated his employment without cause [36-37]; however, the plaintiff failed to establish that a material breach of the written employment agreement by the defendant justified the plaintiff's resignation [37-38].

In a civil action in which the defendant raised as a counterclaim the enforcement of a promissory note, the defense of fraud was not available to the plaintiff, who failed to plead fraud either with sufficient particularity, or as an affirmative defense. [38-39]

This court declined to address whether the defense of estoppel was available as a defense to an action for the enforcement of a promissory note in the circumstances of this case on the limited record and cursory briefing by the parties. [39-40]

CIVIL ACTION commenced in the Superior Court Department on April 23, 2003.

The case was heard by *Kenneth J. Fishman,* J., on a motion for summary judgment.

*Michael L. Rosen* (*Sheila O'Leary* with him) for the plaintiff.

*Bret A. Cohen* (*Jessica C. Sergi* with him) for the defendant.

MILLS, J. Frank R. DiPietro filed a complaint in Superior Court against his former employer, Sipex Corporation (Sipex), claiming that it had breached a written employment agreement because he was terminated "without cause" as defined therein or, alternatively, that he had resigned for "good reason" as defined, because Sipex had materially breached the agreement and materially reduced his title or reporting responsibilities. He sought

damages and other benefits, including forgiveness of a $250,000 loan. Sipex denied the allegations and counterclaimed for the balance of the loan. On Sipex's motion for summary judgment, the judge held that the undisputed facts established that, as matter of law, DiPietro's employment was not terminated by Sipex nor did DiPietro resign for good reason, and that he was obliged to repay the loan balance. We affirm in part and reverse in part.

1. *Standard of review.* Summary judgment is appropriately entered when there is no genuine issue as to any material fact and the moving party is entitled to judgment as matter of law. Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002). *Arcidi* v. *National Assn. of Govt. Employees, Inc.*, 447 Mass. 616, 619 (2006). "The moving party has the burden of demonstrating affirmatively the absence of a genuine issue of material fact on every relevant issue, regardless of who would have the burden on that issue at trial." *Ibid.* See *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 39 (2005). On an appeal from a summary judgment, we recount the facts in the summary judgment materials in the light most favorable to the nonmovant, drawing all permissible inferences and resolving any disputes or conflicts in his favor. *Jupin* v. *Kask*, 447 Mass. 141, 143 (2006). See *Carey* v. *New Eng. Organ Bank*, 446 Mass. 270, 273 (2006). Viewed in this manner, the evidence in the summary judgment record is as follows.

2. *Factual background.* a. *DiPietro's employment with Sipex.* DiPietro served as Sipex's chief financial officer (CFO) for nineteen years. Throughout his tenure, including the period after Sipex became a public company in 1996, he was the second in command of the company, reporting only to the chief executive officer (CEO) and the board of directors (board). As the CFO he was responsible for managing internal financial reporting to the CEO and the board, and he was also responsible for managing a significant portion of the company's operations, including facilities, purchasing, and information technology.

He regularly interacted with members of the board. In addition to preparing financial reports and presenting financial information at all or nearly all of the quarterly board meetings, DiPietro also answered the board's questions and responded to its requests for information. These interactions were a significant

component of his job responsibilities and were the primary way he imparted business judgments regarding the company's finances and contemplated business actions. His effectiveness as the CFO depended on the continued confidence and trust of the board in his ability to provide sound financial data and accurate financial reports.[1]

b. *DiPietro's employment agreement.* The employment agreement (agreement) at issue was executed on May 27, 1999, and guaranteed DiPietro certain severance payments and benefits if Sipex terminated his employment "without cause"[2] or if he terminated his employment for "good reason." Section 3(B)(3) of the agreement states, in relevant part:

> "In the event that the Company exercises its right to terminate the Employee without Cause or the Employee terminates his employment for Good Reason *and* the Employee signs a comprehensive release in the form, and of a scope, acceptable to the Company, the Company agrees to:

> "(i) pay the Employee a lump sum payment equal to eighteen (18) months' base salary at the Employee's then current Base Rate;

> "(ii) pay the Employee [certain bonus money];

> "(iii) allow the Employee to participate [in certain insurance and other benefits] . . ."

(emphasis original). Section 3(B)(1) of the agreement concerning an employee's departure for "Good Reason" states:

> "The Employee may terminate his employment for Good Reason (as defined in Subsection (2) of this Section 3(B)) after giving the Company a written notice of intent to terminate at least thirty (30) days prior to the effective date of such termination."

---

[1]The board was responsible for approving DiPietro's salary, bonus, and stock options, and for the hiring and firing decisions relating to executive officers, including DiPietro.

[2]Sipex has not argued that DiPietro's conduct satisfied any of the "cause" requirements defined in the agreement. Its argument is based on its assertion that it did not terminate DiPietro's employment, for cause or otherwise.

In turn, Section 3(B)(2) defines "Good Reason" as follows:

> "For purposes of this Agreement, termination by the Employee for '*Good Reason*' shall mean the termination of employment by the Employee: (i) as a result of a material breach of this Agreement by the Company; (ii) as a result of a material reduction in the Employee's title or reporting responsibilities as they exist on the date hereof without the Employee's written consent; . . . *provided, however,* that an event described in this Section shall not constitute Good Reason unless it is communicated by the Employee to the Company in writing and is not corrected by the Company to the Employee's reasonable satisfaction within 30 days of the date of the Employee's delivery of such written notice to the Company."

(emphasis original).

c. *Sipex's 2002 internal reorganization.* In 2002, during a matter of months, Sipex underwent a major management reorganization. In June, 2002, Jim Donegan, who had served as CEO for nearly 16 years and to whom DiPietro had reported for all of that time, departed over a disagreement with the board. Other executives, including the company's president and chief technology officer, also departed. In August, 2002, the board hired Walid Maghribi to serve as the new CEO. Shortly after his arrival, Maghribi informed DiPietro that members of the board had told Maghribi during the interview process that the board blamed the management team, including DiPietro, for the company's poor financial situation, and that the board wanted to replace all of the company's high-level executives.

As instructed by the board, Maghribi hired a number of individuals from outside Sipex for positions at or above vice-president level. None of the executives Maghribi hired were given employment agreements with severance provisions as generous as those in DiPietro's agreement. Instead, the new hires were provided contracts with severance provisions comparable to the provision in Maghribi's own agreement, which provided for six months of severance, as opposed to the eighteen months of severance in DiPietro's agreement, if the company terminated the employee.

Within a few weeks after he commenced employment at

Sipex, Maghribi reviewed the agreements for Sipex's incumbent executives and determined that the contracts provided for the payment of hundreds of thousands of dollars in the event of job termination. Maghribi discussed with the board chairman the fact that Sipex had contractually committed to significant severance obligations for a number of executives.

d. *DiPietro and Maghribi discuss stock options.* In September, 2002, Sipex commenced a stock repricing program that allowed employees whose stock options were "under water" (i.e., options for which the stock price the holder must pay to exercise the option is higher than the value of the stock), with the sole exception of DiPietro, to obtain newly-priced options. At that time, all of DiPietro's options were priced at approximately twenty dollars per share, while the stock price was two to three dollars per share. Because DiPietro was prohibited from participating in the option exchange, he asked Maghribi about obtaining additional options at a more attractive price. Maghribi initially responded positively, but ultimately informed DiPietro that he could not receive additional options unless he agreed to "give up" his favorable employment agreement. DiPietro elected not to do so, and he therefore did not obtain additional options.

e. *Maghribi informs DiPietro that the board does not trust his numbers and wants him to leave Sipex.* On November 14, 2002, less than one month after DiPietro refused to give up his agreement, Maghribi had another conversation with DiPietro about stock options, in which Maghribi repeated that DiPietro would only be eligible to receive repriced options if he gave up his existing severance entitlements. When DiPietro questioned why Sipex would require him to cancel his agreement unless it wanted to terminate him, Maghribi informed DiPietro that the board would prefer that he leave Sipex. At that time, Maghribi knew that DiPietro already thought the board did not like him and wanted to replace him. During this conversation, Maghribi informed DiPietro that the board did not trust the numbers he reported and believed that he was withholding information. In the same conversation, Maghribi informed DiPietro that, while he (Maghribi) personally wanted DiPietro to stay, the board would prefer that he leave.

DiPietro explained to Maghribi that he could not do his job if

the board did not trust him. Because DiPietro's ability to perform his job depended on the board's continued confidence and trust in his abilities, his performance, and the accuracy of his financial reporting, DiPietro understood Maghribi's statements to mean that he was no longer able to effectively serve as the company's CFO.

DiPietro thereafter notified Maghribi in writing, on November 22, 2002, that he was forced to leave the company because it had breached the agreement and had taken away his ability to perform his job responsibilities. In this letter, DiPietro restated what Maghribi had told him on November 14, 2002, including that the board would prefer that he leave Sipex. DiPietro further explained that it was obvious to him that the board no longer valued his services and had pushed him out of his job. The letter indicated that he was giving Sipex thirty days' notice of his departure, as required by the agreement. Three days later, Maghribi asked DiPietro to reconsider, but DiPietro resubmitted his notice of departure.

f. *The company's response.* After DiPietro presented his notice of departure for "good reason," neither the board itself nor any of its individual members communicated in any way a desire for him to remain. Maghribi never stated that anything in DiPietro's letter was untrue or inaccurate, nor informed DiPietro that the board would prefer that he remain with Sipex. Indeed, after DiPietro presented his notice of departure on Friday, Maghribi did not speak with anyone on the board about the matter for four days. Rather, shortly after DiPietro presented his notice, Sipex attempted to negotiate the terms of the separation and sought to pay him less than provided for in the agreement. On November 26, 2002, Maghribi called a special board meeting to discuss DiPietro.[3]

Nearly a week later, Maghribi made a proposal to DiPietro concerning the terms of his transition, "in case you decide to leave the Company." On December 2, 2002, DiPietro informed

---

[3]The initial draft minutes of the meeting state that the board approved DiPietro's resignation; the minutes were later amended to state that the board approved DiPietro's "anticipated resignation." Viewed in the light most favorable to DiPietro, the record reflects that Sipex was not terminating DiPietro for cause, as defined in the agreement.

Maghribi that the company's proposal was unsatisfactory because it had breached the agreement and was unwilling to pay the guaranteed severance benefits. Within an hour of receiving DiPietro's response, and without consulting him, Sipex issued a press release announcing his resignation. DiPietro was escorted out of Sipex's facility on that same day, and he was paid only through that day.

g. *The $250,000 promissory note.* In 1998, Sipex paid DiPietro a $250,000 bonus. Donegan, then the CEO, told DiPietro that the payment would be structured as a loan to defer the compensation over a period of time so that it did not appear that Sipex was paying one employee more than others. Donegan assured DiPietro that he would not have to repay the loan, for which no collateral was required.

On December 14, 1998, DiPietro executed an original promissory note which provided that DiPietro promised to pay to Sipex the principal sum of $250,000, together with interest at the rate of eight percent, and further provided that it "shall be paid on the first anniversary of the date hereof." Sipex did not seek to collect on that note after one year, but requested, two years later, a virtually identical promissory note relating to the $250,000 payment.

DiPietro was never given a repayment schedule and he was never asked to repay the money. He signed the promissory notes in reliance on Donegan's assurance that the money would not have to be repaid, and Donegan explained that the notes were necessary because the attorneys wanted the payment to appear as an arm's-length transaction.

In May, 2001, Donegan informed DiPietro that the loan had been forgiven and that the board structured it as a four-year forgiveness, with forgiveness beginning May 17, 2001, so that DiPietro would not be burdened with substantial income taxes associated with the forgiveness during any one year. When Donegan told DiPietro in May, 2001, that the payment would be forgiven over four years, DiPietro understood that he would be able to work for the company during those four years, and that he would never be asked to repay the money, because that is what he was first told when he received the bonus payment.

In December, 2001, DiPietro executed another promissory note. That note did not mention the board's May, 2001, forgiveness.

DiPietro's employment with Sipex ended in December, 2002, before the forgiveness was fully effected, yet Sipex made no demand for repayment until asserting its counterclaim in this action.

3. *The proceedings.* DiPietro complained in Superior Court that Sipex had breached the agreement relating to termination of DiPietro's employment, seeking damages related to (a) severance pay and benefits as provided by the agreement; and (b) relief as to the $250,000 promissory note.[4] Sipex answered asserting no contractual breach, and by counterclaim sought payment on the balance of the note. Following discovery, Sipex moved for summary judgment on DiPietro's contract claim and its counterclaim. A judge held that the undisputed material facts established that Sipex had not violated the employment agreement, i.e., that DiPietro was neither terminated without cause, nor did he resign for good reason, and that he was obliged to pay the balance on the note.

We conclude that the judge erred with respect to the contract claim asserting termination without cause because there are disputes of material fact whether Sipex terminated his employment without cause. As to the promissory note, a summary judgment is not supported on this record.

4. *Discussion.* a. *DiPietro's claim for breach of contract.* Where, as here, the party opposing summary judgment will have the burden of proof at trial, the moving party can prevail upon demonstration "that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Tetrault* v. *Mahoney, Hawkes & Goldings,* 425 Mass. 456, 459 (1997), quoting from *Symmons* v. *O'Keeffe,* 419 Mass. 288, 293 (1995). The central question here is whether DiPietro has demonstrated a "toehold" on his breach of contract claims

---

[4]The complaint also asserts a claim for relocation expenses that was not addressed by the summary judgment decision. The claim appears to be based not on the written agreement at issue here, but on a letter from the then CEO, Donegan, promising reimbursement for certain relocation expenses. To the extent this claim was disposed of by the summary judgment decision, in light of our resolution of the remaining claims, summary judgment as to the claim for relocation expenses is also reversed.

sufficient to withstand summary judgment. See *Scotti* v. *Arrow Electronics Inc.*, 37 Mass. App. Ct. 954, 955 (1994). Having examined the evidence in the light most favorable to DiPietro, we conclude that as to the claim that he was terminated without cause, he has so demonstrated.

We must accept as true that the CEO told DiPietro that the board did not believe his financial reporting, and that the board blamed him and the other management team players (in the process of being replaced) for the company's recent business declines. The CEO also informed DiPietro that the board would prefer that he leave the company. Those statements, made in the context of an ongoing reorganization of the company, the departure of many other high-level executives, and the repeated attempts to alter DiPietro's severance agreement, could reasonably be construed by a fact finder as a request by the board that DiPietro submit his resignation. See *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 808, 812 (1991) (treating employee's resignation after request by employer that he resign as discharge); *Gates* v. *Flood*, 57 Mass. App. Ct. 739, 743 n.10 (2003) (treating demand that employee retire or that he would be involuntarily retired as discharge). See also *GTE Prods. Corp.* v *Stewart*, 421 Mass. 22, 33-34 (1995) (constructive discharge occurs when employer's conduct effectively forces employee to resign). DiPietro's letter to the board after the CEO made the "prefer that you leave" statement can be read as an acknowledgment that DiPietro would abide by the board's decision that he leave.[5] DiPietro has established that there is, at minimum, a factual question whether his employment with Sipex was terminated without cause, entitling him to the severance benefits outlined in the agreement.

We do not agree, however, that DiPietro has established at least a "toehold" on his alternative claim that he terminated his employment with Sipex for "good reason" as defined in the

---

[5]Maghribi's request that DiPietro reconsider his resignation, and DiPietro's refusal to do so, does not alter this result. The summary judgment record contains information from which a fact finder could determine that the board, not the CEO, controlled the hiring and firing of officers. In addition, the summary judgment record reflects that a prior effort by the CEO to intervene on DiPietro's behalf before the board (to obtain additional stock options) was unsuccessful.

agreement. DiPietro argues that Sipex's material breach of the agreement constitutes a "good reason" for his termination of his employment with Sipex.[6] A breach of contract is material when the breach is "of an essential and inducing feature of the contract[]." *Lease-It, Inc.* v. *Massachusetts Port Authy.*, 33 Mass. App. Ct. 391, 396 (1992), quoting from *Bucholz* v. *Green Bros.*, 272 Mass. 49, 52 (1930). Whether a material breach has occurred is a question of fact, see *Prozinski* v. *Northeast Real Estate Servs., LLC,* 59 Mass. App. Ct. 599, 609-610 (2003), ordinarily to be decided by a jury. *Lease-It, Inc.* v. *Massachusetts Port Authy.*, *supra.*

DiPietro does not identify any specific provision of the agreement that has been breached, but rather argues, fundamentally, that an essential and inducing feature of his employment agreement was his desire to be employed by the company and the company's desire that he be employed. Maghribi's statements, indicating the board's displeasure and desire that he leave the company, therefore breached this fundamental feature of his employment agreement. DiPietro's argument ignores the severance provision of the agreement, which clearly contemplates Sipex's right to terminate DiPietro's employment at any time without cause, albeit with the requirement that severance payments be made. Accordingly, as matter of law, DiPietro has not established that a material breach of the agreement by Sipex justified his resignation.

b. *The promissory note.* In response to Sipex's motion for summary judgment on its counterclaim, DiPietro argued unenforceability of the note because (1) he had been fraudulently induced to sign, and (2) Sipex should be estopped from enforcement. The judge rejected the defenses, disallowing parol evidence and ruling that the estoppel defense was not available on a legal, as opposed to an equitable, claim. We conclude that the properly pleaded defense of estoppel is available to DiPietro, and accordingly reverse the grant of summary judgment on Sipex's counterclaim.

We first discuss DiPietro's assertion of the defense of fraud. Sipex argues, inter alia, that DiPietro failed to plead fraud with

_____

[6]It does not appear to be disputed for summary judgment purposes that Sipex's board did not attempt to correct or otherwise remedy the reasons given by DiPietro for his resignation.

sufficient particularity, as required by Mass.R.Civ.P. 9(b), 365 Mass. 751 (1974), and, accordingly, should not be permitted to argue fraud in this appeal.

DiPietro did not advance a fraudulent inducement defense until he filed his response to Sipex's Superior Court Rule 9A(B)(5) (1998) statement in support of its motion for summary judgment on the counterclaim. Under the heading "applicable legal principles," DiPietro, citing *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1 (1982), asserted that he was "fraudulently induced to sign the promissory notes because Sipex falsely misrepresented to [him] that he would not have to repay the payment, he reasonably relied on that statement in signing the notes, and he has been harmed by his reliance on those statements."

After DiPietro filed his rule 9A papers, Sipex objected in its reply in support of its motion for summary judgment on its counterclaim to his failure to allege fraud as a defense in his answer to Sipex's counterclaim, and to his failure to plead fraud with particularity. Sipex reiterated the objection in its brief to this court.

Massachusetts Rule of Civil Procedure 8(c), 365 Mass. 749 (1974), requires that parties plead fraud as an affirmative defense. Massachusetts Rule of Civil Procedure 9(b), 365 Mass. 751 (1974), further mandates that "[i]n all averments of fraud, . . . the circumstances constituting fraud . . . shall be stated with particularity." In not clearly raising the defense of fraud until he responded to Sipex's summary judgment papers, DiPietro failed to abide by both rules. Although he relied on a reason other than failure of pleading requirements, the trial judge was therefore correct in his decision that the defense of fraud is not available to DiPietro. See *Vaughan* v. *Eastern Edison Co.*, 48 Mass. App. Ct. 225, 226 (1999) (we affirm the allowance of a motion for summary judgment on grounds other than those given by the motion judge).

In his answer to the Sipex counterclaim, DiPietro pleaded, generally, the affirmative defense of estoppel. The judge ruled that "[t]he doctrine of equitable estoppel is a defense to a claim that is equitable in nature, and is not available as a defense to a legal claim such as an action on a promissory note," citing

*Srebnick* v. *Lo-Law Transit Mgmt., Inc.,* 29 Mass. App. Ct. 45, 49 (1990) ("Laches is available . . . as a defense to a claim that is equitable in nature . . . [and] is not generally available as a defense to a legal claim").[7] The authorities cited by the parties are not helpful.[8]

> "In considering a motion for summary judgment, a court looks for *two* things: (1) A total absence of genuine dispute as to any material fact; *and* (2) A resultant rule of law (statutory or decisional) *compelling* a decision for one or the other party. The moving party bears the burden of convincing the court's mind on each point."

(Emphasis supplied.) Smith & Zobel, Rules Practice § 56.8 (1977).

We are not persuaded that there is an unambiguous and compelling rule of law in Massachusetts making estoppel unavailable as a defense to an action for the enforcement of a promissory note in the circumstances of this case.[9] We decline to address this issue directly on the limited record before us and in light of the cursory briefing provided by the parties. DiPietro may proceed with his defense of estoppel.

---

[7]We note that *Srebnick* v. *Lo-Law Mgmt., Inc., supra,* addressed laches, not estoppel. The *Srebnick* court cited Smith & Zobel, Rules Practice § 8.17 (1974), which noted the substantive rule making laches inapplicable to an action at law, but also noting that, procedurally, equitable defenses may be raised in actions at law. *Srebnick* v. *Lo-Law Transit Mgmt., Inc.,* 29 Mass. App. Ct. at 50 n.2. See Smith & Zobel, Rules Practice § 8.13 (2d ed. 2006). The authors comment that "[e]stoppel may be argued in either a legal or an equitable claim." *Ibid.*

[8]DiPietro does not directly confront the judge's ruling, but cites *Cellucci* v. *Sun Oil Co.,* 2 Mass. App. Ct. 722, 728 (1974) (explaining the elements of estoppel), and *Harrington* v. *Fall River Hous. Authy.,* 27 Mass. App. Ct. 301, 307 (1989) (stating that estoppel is an equitable doctrine created to prevent one from benefiting from his own wrongdoing and to avoid injustice). Sipex, in support of the judge's ruling on estoppel, cites only to *Srebnick* v. *Lo-Law Transit Mgmt., Inc., supra.*

[9]We note that estoppel is respected, in varying degrees and under varying circumstances, as an available defense to a claim for enforcement of a promissory note in several jurisdictions. See, e.g., *Undem* v. *First Natl. Bank Springdale, Ark.,* 46 Ark. Ct. App. 158 (1994); *Fair Oaks Bank* v. *Johnson,* 198 Cal. 196 (1926); *San Diego Mun. Credit Union* v. *Smith,* 176 Cal. App. 3d 919 (1986); *Louis Pizitz Dry Goods Co.* v. *New York Hamilton Corp.,* 228 A.D. 325 (N.Y.1930); *NationsBank of Va., N.A.* v. *Toms,* 28 Va. Cir. 378 (1992); *Hulse* v. *First Interstate Bank of Commerce-Gillette,* 994 P.2d 957 (Wyo. 2000). Indeed,

The judgment granting summary judgment on Sipex's counterclaim for payment of the promissory note and on that part of DiPietro's contract claim alleging that he was terminated without cause is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

some jurisdictions clearly recognize estoppel as a defense to actions at law. See, e.g, *Twin City Fire Ins. Co.* v. *Country Mut. Ins. Co.*, 23 F.3d 1175, 1179 (7th Cir. 1994) ("equitable defenses [such as estoppel] are defenses to legal as well as to equitable claims"); *Ricketts* v. *Scothorn*, 57 Neb. 51, 57 (1898) ("Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, or contract, or of remedy" [citation omitted]); *Gaymon* v. *Richland Memorial Hosp.*, 327 S.C. 66, 67 (1997) ("a defense of equitable estoppel interposed in a law case should be tried by the court as an equitable issue"). Accord Amar & Katyal, Executive Privileges and Immunities: The Nixon and Clinton Cases, 108 Harv. L. Rev. 701, 724 (1995) ("Historically, as an 'equity' doctrine, laches did not apply to cases 'at law' governed by explicit statutes of limitation. After the historic merger of law and equity in 1938, however, those old distinctions should matter little here. Other formerly 'equitable' defenses, such as estoppel and fraud, have long been allowed to defeat actions 'at law' ").