van Gestel, Allan, J.
This matter is before the Court on cross motions to summary judgment: Plaintiffs’ Motion for Partial Summary Judgment, Paper #24; and Defendant Cabot Corporation’s Cross Motion for Partial Summary Judgment, Paper #26. The parties each seek only partial summary judgment, taking opposite sides on issues relating to a “most favored customer’’ (“MFC”) clause and its application in a January 1, 2001 supply contract (the “2001 Supply Agreement”) between AVX Corporation and AVX Limited, as buyers, and Cabot Corporation (“Cabot”), as seller, of certain tantalum products.
BACKGROUND
There has been prior litigation between AVX and Cabot over the 2001 Supply Agreement, Cabot Corporation v. AVX Corporation, Suffolk No. 02-1585 BLS, which led to summary judgment in favor of Cabot on September 25, 2002, and an appeal to the SJC thereafter, affirming the decision. See Cabot Corporation v. AVX Corporation, 448 Mass. 629 (2007). Full familiarity with those decisions is presumed.
Some of the following facts were established before this Court in the prior litigation.
Tantalum products are used in the production of high performance electronic capacitors.
AVX Corporation is one of the world’s largest manufacturers and seller of tantalum capacitors. Capacitors are passive components that are used in a wide range of modem electronic devices, including cellular telephones and personal computers. The other plaintiff, AVX Limited, is a wholly-owned subsidiary of AVX Corporation. A majority of AVX Corporation’s shares are owned by Kyocera Corporation, a Japanese conglomerate. Hereafter, unless necessary to distinguish otherwise, AVX Corporation and AVX Limited will be referred to as (“AVXj.
The shares of each of Cabot Corporation and AVX Corporation are publicly-traded on the New York Stock Exchange, and each has annual sales of more than one billion dollars. These companies are highly sophisticated in the business that is the subject of this litigation.
Tantalum is an elemental metal (chemical symbol “Ta,” atomic number 73) that is approximately as rare in nature as uranium. Tantalum is extremely resistant to corrosion, is highly ductile, and has a high dielectric constant across a broad range of temperatures. Consequently, tantalum is a preferred raw material for high performance electronic capacitors.
Historically, the market for tantalum has been highly volatile. Periods of high demand, intermittent supply shortages, inventory hoarding, and sharply rising prices have been followed by recurring episodes of reduced demand, over-production, large customer inventories and rapidly falling prices. Although prices of other industrial metals frequently parallel general economic cycles, the relative scarcity of tantalum and its historical susceptibility to supply shortages have caused fluctuations in the price of tantalum to be much more pronounced than those of other industrial metals.
Cabot and AVX have a history with each other in purchasing and selling tantalum that goes back for many years. They each understand the peculiar nature of the industry, its fluctuations, and the essence of how products sold by Cabot to AVX are manufactured, and the timing thereof.
Cabot has been one of four suppliers of tantalum products to AVX. Immediately prior to the events that were at issue in the prior case, Cabot was supplying approximately 20% of AVXs total tantalum needs.
In the years prior to 2001, AVX and Cabot typically executed one- or two-page “Letters of Intent,” which described the annual quantities of tantalum products that AVX then anticipated buying from Cabot, and the prices that AVX then was willing to pay Cabot for those products. These Letters of Intent were simple good faith estimates of AVXs anticipated needs that did not bind AVX to make actual purchases from Cabot. In fact, AVX refers to them as requirements contracts, meaning that it only will buy from Cabot what it needs of tantalum products, presumably up to the amounts stated in the letters. The letters were designed to assist Cabot in its production planning. In practice, AVXs actual purchases frequently varied from the amounts stated in the Letters of Intent. As a result, Cabot experienced significant fluctuations in its sales of tantalum products to AVX.
Over a period of years prior to mid-2000, Cabot attempted to convince AVX to enter into binding, long-term supply agreements for tantalum products; but AVX declined to do so.
In January 2000, AVX and Cabot signed two Letters of Intent, one relating to tantalum powder and the other relating to tantalum wire. In these letters, AVX stated its “intention to purchase” certain quantities of tantalum products from Cabot in 2000 and 2001 (the “2000 Letters of Intent”).
During the year 2000, demand for tantalum capacitors experienced a period of unprecedented growth. Orders from some of AVXs customers increased by more than 200%. By the summer of 2000, a tantalum shortage had become evident. Because supplies of tantalum ore, and the production capacity of the manufacturers of tantalum powder and wire, were limited in the short run, the supply of tantalum prod *430 ucts could not keep pace with the sharply-rising demand for tantalum capacitors. As a result, AVX was not able to procure from its tantalum product suppliers the quantity of tantalum products that it needed to keep up with the demand for tantalum capacitors. As shortages occurred, the price of tantalum products rose.
In August 2000, Cabot informed its customers that, beginning in 2001, it would allocate scarce tantalum products to those customers who were prepared to enter into binding, long-term contracts with Cabot. Letters announcing Cabot’s decision were distributed to all of its major customers, including AVX.
Between August and November 2000, AVX and Cabot engaged in negotiations with respect to a contract that would govern the parties’ future relationship. Their respective representatives made proposals and counter-proposals.
In the course of these negotiations, a dispute arose as to whether Cabot was bound by the 2000 Letters of Intent to supply tantalum product to AVX until the end of 2001. AVX insisted Cabot was bound and Cabot asserted that the 2000 Letters of Intent were not binding.
In early November 2000, the parties reached tentative agreement on the material terms of a five-year contract. Consistent with their negotiations, in January 2001, AVX and Cabot executed the 2001 Supply Agreement. The 2001 Supply Agreement obligated AVX to buy, and Cabot to sell, specified quantities of tantalum powder, wire and a precursor product called “K2TaF7" over a five-year period, at prices set forth in the agreement. Other provisions of the 2001 Supply Agreement address ordering procedures, payment terms, AVX’s right to price reductions if Cabot were to sell tantalum products to AVXs competitors at prices below those stated in the agreement, AVX’s right to purchase a share of product resulting from a capacity expansion by Cabot, product warranties, scrap purchases and a variety of other issues.
Section 10 of the 2001 Supply Agreement reads as follows:
This Agreement constitutes the entire understanding of the parties and supersede [s] all prior purchase orders . . . discussions, agreements and letters of intent between the parties, including without limitation, AVX purchase orders listed on Appendix A and the existing Letters of Intent between [Cabot] and AVX respecting tantalum wire and tantalum powder (individually and collectively the “Prior Agreements”) all of which shall have no force and effect and shall create no liabilities or obligations for either party or any affiliate of either party. This Agreement also constitutes full accord and satisfaction between Buyer and [Cabot] with respect to the Prior Agreements. Buyer and [Cabot] hereby each release each other from any and all claims and causes of action relating to, or arising under, the Prior Agreements that Buyer and [Cabot] may now or hereafter have.
By a letter dated November 12, 2001, the parties agreed to modify the 2001 Supply Agreement in certain respects. In pertinent part, the letter reads:
I am writing to make a specific request of Cabot. The contract [the 2001 Supply Agreement] specifies that AVX Biddeford will take from you 5,000 pounds of “as available” product in calendar year 2001. The contract was executed during a period of exceptional demand for tantalum capacitors, and the intent of this clause was to allow AVX to obtain extra powder to service our customers. As you well know, at this time and for the forseeable future, we have absolutely no use for this tantalum powder. This $2.5 million purchase will only result in further degradation of our financial health. We request that Cabot excuse this portion of our contract.
In late 2001, Cabot had difficulty supplying the full amount of a particular type of tantalum powder (called C-275) that was stated in the 2001 Supply Agreement. At Cabot’s request, AVX agreed to reduce the amount of C-275 powder that Cabot would have to deliver in 2002.
AVX and Cabot performed under the 2001 Supply Agreement. From January 2001 to July 2002, AVX purchased more than $173,000,000 of tantalum products from Cabot in 469 separate transactions, at the prices, on the terms, and in the amounts, specified in the 2001 Supply Agreement. AVX continued to purchase tantalum products from Cabot. As of October 2003, AVX had purchased more than $342,809,077.50 of tantalum products in 739 separate transactions under the 2001 Supply Agreement. Over the same period, AVX had sold to Cabot $5,263,271 of tantalum scrap in 18 separate transaction, also in compliance with the 2001 Supply Agreement.
In the prior litigation, after this Court’s decision on summary judgment, a final judgment entered on July 28, 2005, which included the following declaration:
(1) The 2000 Letter of Intent was not a valid and binding contract between Plaintiff, Cabot Corporation, and Defendants AVX Corporation or AVX Limited, but rather was a non-binding, good faith estimate of the Defendants’ anticipated needs; (2) Plaintiff did not breach any obligations that it had, or may have had, to Defendants under the 2000 Letter of Intent, including any obligation imposed by the implied covenant of good faith and fair dealing; (3) the 2001 Supply Agreement was not induced by undue economic duress, but rather was voluntarily entered into by the Plaintiff and the Defendants; (4) the 2001 Supply Agreement is valid and binding upon the Plaintiff and the Defendants; (5) Defendants repeatedly have ratified the terms of the 2001 Supply Agreement through their subsequent conduct; (6) pursuant to the terms of the *431 2001 Supply Agreement, the Defendants released any claims or other contractual rights that they had, or may have had, against Plaintiff as of the date on which that Agreement was executed; and (7) Plaintiff did not engage in any unfair or deceptive acts or practices (willful, knowing, or otherwise) that violate G.L.c. 93A in its business dealings with the Defendants leading up to, and including, the execution of the 2001 Supply Agreement.
It was this judgment that was affirmed by the SJC in Cabot Corporation, 448 Mass. at 646.
What is at issue in the present cross motions relates to the most favored customer — the MFC — provision in the 2001 Supply Agreement. It appears in Section 3 and reads:
If [Cabot] sells any grade of tantalum powder or wire from its “Base Capacity” [a defined term that is not relevant to the instant motions] to a third party for delivery in CY 2003, 2004, or 2005 at a price (FCA Boyertown) that... is less than [AVX’s] price under this Agreement for an equivalent grade of tantalum powder ... or wire [also defined, also not relevant to these motions] then [AVX’s] price for a subsequent purchase of the same quantity and grade of tantalum powder or wire shall be reduced to the lower third party price . . .
The preceding paragraph shall not, however, apply with respect to ... contracts entered into by [Cabot] prior to the date of this Agreement.
There are two issues that AVX and Cabot are in disagreement about regarding the application of the MFC provision.
The first point of contention is whether certain non-price-related amendments to a preexisting contract with another customer converted that agreement into a new contract and triggered MFC rights with respect to that “new” contract. The other customer is Vishay Sprague, Inc. and Vishay Intertechnology, Inc. (collectively, “Vishay”). Vishay is a competitor of AVX.
The second point of contention is whether what the parties call a “double customer” approach must be applied under the MFC provision.
There also are disputes between AVX and Cabot as to Cabot’s affirmative defenses of waiver and of estop-pel.
DISCUSSION
Rule 56(c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 824 (1974), provides that summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” We view the evidence in the light most favorable to the nonmov-ing party. See BayBank v. Bornhofft, 427 Mass. 571, 573 (1998).
Vittands v. Sudduth, 49 Mass.App.Ct. 401, 405-06 (2000).
Thus, summary judgment is granted where, viewing the evidence in the light most favorable to the non-moving party, there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Cabot Corporation, 448 Mass. at 636-37; Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). “[T]he moving party must establish that there are no genuine issues of material fact, and that the non-moving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
While we examine the record in its light most favorable to the nonmoving party, Foster v. Group Health, Inc., 444 Mass. 668, 672 (2005), “[c]onclus-oiy statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment” (citations omitted). Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987). “If the opposing party fails properly to present specific facts establishing a genuine, triable issue, summary judgment should be granted.” Id.
O’Rourke v. Hunter, 446 Mass. 814, 821-22 (2006).
“ ‘[T]he party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.’ Wheatley v. American Tel. & Tel. Co., 418 Mass. 394, 397 (1994), quoting Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1994).” Symmons v. O’Keefe, 419 Mass. 288, 293 (1995). See also DiPietro v. Sipex Corp., 69 Mass.App.Ct. 29, 36 (2007).
Here, of course, both sides are moving parties. Consequently, the burden may shift back and forth depending upon which side’s motion is under consideration.
Before stating its conclusions, this Court pauses to observe that the parties in this case are extremely sophisticated, all certainly had constant advice and assistance from highly competent counsel, and all benefitted from their extensive experience in the tantalum industry. These sophisticated parties negotiated and chose specific language to state their intentions in the 2001 Supply Agreement. Here, there was no disparity in bargaining power or lack of sophistication about the matter at hand. As the SJC said in *432 its decision on the appeal of the prior litigation, speaking specifically about AVX and Cabot: “Where knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document .. . they are entitled to and should be held to the language they chose.” Cabot Corporation, 448 Mass. at 638.
The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instrument that are specifically anticipated and addressed therein overwhelm or change the document itself. “ [Agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). “It is not the role of the court to alter the parties’ agreement.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). Nor is this a time for the Court to attempt to be smarter than the parties.
Part of what is involved here is the interpretation of portions of the 2001 Supply Agreement. The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language generally must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contractual provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contract language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“The object of the court is to construe the [2001 Supply Agreement] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the 2001 Supply Agreement as a rational business instrument in order to cariy out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
This Court does not find the 2001 Supply Agreement to be ambiguous on all of the issues presented by the present motions. Consequently, the Court may, and should, proceed where possible and as a matter of law to decide its meaning. Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002).
The Court now turns to the contentions presented.
The prior agreement exclusion.
Cabot had entered into a supply agreement with Vishay in July 200o (the “Vishay 1 Contract”).[1] This contract, like that with AVX, was for the purchase and sale of tantalum products. AVX was aware that Vishay had a contract to buy tantalum at a lower price prior to the discussions between AVX and Cabot that led to the MFC provision. In AVX’s response to Cabot’s Superior Court Rule 9A statement of material facts, para. 35, AVX stated: “AVX objects to para. 35 as immaterial. The contract to be construed by the Court provides that AVX’s MFN[2] price protection does not apply to sales made under contracts entered into prior to January 1, 2001.”
Further, AVX’s president stated in an October 30, 2000 e-mail that: “On contracts that Cabot has renegotiated and signed before August of the year 2000, the most favored customer price would be excluded for that contracted volume only.” The Vishay 1 Contract was signed before August 2000.
In November 2000, Cabot entered into a second supply contract with Vishay (the “Vishay 2 Contract”). AVX was also aware of that contract.
Thus, AVX concedes the point that sales made under the original Vishay 1 Contract are not subject to the MFC provision.
In the June 2002 settlement of the litigation between Cabot and Vishay, the Vishay 1 Contract was amended by an “Amended and Restated” supply agreement. The changes made by the amendment were to ensure that Vishay did not avoid its pre-existing purchase obligations to Cabot. Vishay agreed that it would purchase tantalum products ratably over the course of each contract year. Also, Vishay Intertechnology was added as a party to the Vishay 1 Contract and guaranteed the purchase obligations of Vishay Spra-gue, Inc. There was no change, however, to the quantities of tantalum powder and wire that Vishay had agreed to purchase and no change in the prices at which those purchases were to be made.
AVX has admitted Cabot’s statement of undisputed facts, para. 39, which states: “By its terms, the MFC protection provided in Section 3 of the 2001 Supply Agreement went into effect on January 1, 2003.”
Where ... as here, the material facts are not in dispute, and the question of the parties’ intention turns on the language of original and revised written agreements, “the question of intention [is] to be determined by the usual process of interpretation, implication, and construction . . . The question in such cases is one of law for the court.”
The Community Builders, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass.App.Ct. 537, 548 (1998).
*433 The Vishay 1 Supply Contract, as amended in the 2002 settlement, was, like the AVX agreement here, between very sophisticated parties, and obviously with the assistance of counsel. Thus, again, this Court must not stray from the language employed therein. Significantly, the Amended and Restated Vishay 1 Contract has two provisions of significance. The first provision is in the very first paragraph, second sentence, and reads: “This Agreement amends and restates in its entirety the Supply Agreement made the 14th day of July 2000.” (Emphasis added.)
The second provision is in Section 10, an integration clause, reading in material part: “This Agreement, the Amendment Agreement, the Amended November Agreement, the Releases (as defined in the Amendment Agreement) constitutes the entire understanding of the parties and supersedes all prior agreements and discussions among the parties respecting the subject matter hereof and thereof, including, without limitation, the Original Agreement.”
The integration language included by Cabot and Vishay in the Amended and Restated Vishay 1 Contract must be read as the full and final expression of those parties’ agreement. “ [Agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman, 331 Mass. at 406. No special circumstances have been demonstrated here.
What the initial statement in the first paragraph— "amending] and restating] in its entirely the Supply Agreement made the 14th day of July 2000" — and the foregoing integration clause have the legal effect of doing is create a new agreement that supersedes the original July 14, 2000 agreement. Consequently, it, like the November 2000 Vishay 2 Supply Contract, is subject to the MFC provisions in the 2001 Supply Agreement between Cabot and AVX.
The double customer/single customer issues.
For a period up until late 2004, Cabot calculated AVX’s MFC discounts and credits using what has been referred to by the parties as the “double-customer approach.” Under this approach, AVX received a credit equal to the price reduction afforded to Cabot’s most favored customers, multiplied by the volume sold at that price to all of Cabot’s other customers. This had the effect of allowing AVX to purchase, at the much lower price, tantalum product from Cabot in amounts that had been purchased by all of AVXs competitors combined.
Cabot considered this to be an error, which they realized and “corrected” in late 2004. Cabot then revised its method of making MFC calculations so as to give AVX the benefit of the pricing and quantities afforded by Cabot to its single most favored customer in each quarter.
AVX argues that the 2001 Supply Agreement permits, indeed it would say compels, the double-customer approach. The sentence from the MFC provision, stripped to what is in issue here, reads: “If [Cabot] sells any grade of tantalum powder or wire ... to a third party for delivery in CY 2003, 2004, or 2005 at a price (FCA Boyertown) that ... is less than [AVX’s] price under this Agreement for an equivalent grade of tantalum powder ... or wire . . . then [AVX’s] price for a subsequent purchase of the same quantity and grade of tantalum powder or wire shall be reduced to the lower third party price.” Thus, AVX argues that this language requires that each sale of tantalum powder or wire to any third party fits within this categorical definition.
What controls the interpretation here is an analysis of what effect, if any, the word “a,” before the words “third party," means. This Court has stumbled over the meaning of “a” as a modifier before, as the Appeals Court was quick to note.
While the judge’s construction ... is plausible, we are not convinced that it is the only, or even the most persuasive, view of the language. “(T]he particle ‘a’ is not necessarily a singular term; it is often used in the sense of ‘any,’ and is applied to more than one individual object.” . . . We consider it unlikely that, had the parties intended to resolve the question whether an eligible member could enter into only one or both agreements, they would have done so by reliance on the article “a” as a modifier . . . More precise language was available. The word “a” strikes us as too skimpy a foundation on which to place such weight.
President and Fellows of Harvard College v. PECO Energy Company, 57 Mass.App.Ct. 888, 892 (2003).
Given the Appeals Court’s comments in a not wholly dissimilar situation — this Court attempting to interpret “a” as a limiting word in a contract, as a result of arguments on a motion for partial summary judgment — it seems best not to make that mistake again. Thus, the Court follows further the Appeals Court’s direction in PECO.
Neither party’s interpretation of the contracts commends itself to us to the exclusion of the other. We therefore conclude that the agreements by themselves do not reveal an answer to the question at issue, if indeed there is one. This is the essence of ambiguily. Contract language is ambiguous “where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.”
Id. at 895-96.
While the Appeals Court in PECO points to a path to follow in such a situation, the Court does not find that path satisfactory or fair to either side here. Rather, on this issue, it will leave the matter for determination by the finder or finders of fact at trial.
*434 The defendant’s affirmative defenses.
Cabot’s affirmative defenses of waiver and estoppel are, as it argues, too deeply infected with genuine issues of material fact to be resolved on summaiy judgment. Involved are AVX’s knowledge and its claimed acquiescence in, and implicit approval of, the contractual practices of which it now complains.
ORDER
For the foregoing reasons, the Plaintiffs’ Motion for Partial Summaiy Judgment, Paper #24, is ALLOWED in part as to paragraph 1 thereof, and DENIED in part as to paragraphs 2 and 3 thereof; and Defendant Cabot Corporation’s Cross Motion for Partial Summary Judgment, Paper #26, is DENIED.
The parties are urged to request a status conference with the successor Justice in this Session, upon his arrival, after January 7, 2008.

Although not relevant here, the Vishay/Cabot relationship was also the subject of litigation before this Court. See Cabot Corporation v. Vishay Intertechnology, Inc. et al., Suffolk No. 02-1584. This case was filed on April 10,2002, and settled shortly before June 14, 2002, with a Stipulation of Dismissal being filed on June 13, 2002 as Paper #12.

AVX calls what is described above as the “MFC” (most favored customer!, “MFN,” standing for most favored nation. There is no significance to this minor point.