van Gestel, Allan, J.
This matter is before the Court on three motions: Plaintiff Howard L. Carr’s Motion for Judgment on the Pleadings, Paper #11; Entercom’s Cross Motion for Partial Summaiy Judgment, Paper #15; and Entercom’s Cross Motion to Stay Decision on That Portion of the Motion for Judgment on the Pleadings Related to the Right to Match, Paper #18.

BACKGROUND

This action was filed on July 10, 2007. The Complaint opens with a Preamble stating that “Massachusetts General Laws c. 149, §186 makes illegal the enforcement of non-competition agreements and other *139 post-employment restrictions against broadcasters.” It then asserts that the plaintiff, Howard L. Carr (“Carr”), “seeks immediate relief to prevent his current employer from utilizing illegal and unenforceable contract provisions to restrain his legal right to pursue a new employment opportunity in the radio broadcasting industry.”
The defendant, Entercom Boston, LLC (“En-tercom”), has answered and filed a seven-count Counterclaim, Paper #7, seeking money damages and a declaration that Section VIII of the Standard Terms and Conditions, attached as part of Carr’s “Artist’s Agreement” with Entercom, is valid, binding and enforceable and that Entercom validly exercised its rights thereunder such that Carr is bound by the terms of his Artist’s Agreement from October 1, 2007 through September 30, 2012.
The undisputed facts are relatively simple to state, this being essentially a case involving the meaning and application of a detailed written agreement between sophisticated and fully represented parties and the effect of a special statute thereon.
On June 3, 2002, Carr and Entercom entered into the “Artist’s Agreement” relating to Carr’s employment by Entercom for the period from September 20, 2003 through September 19, 2007. On September 19, 2007, the Artist’s Agreement appears to terminate by its own terms.
Carr touts himself as “a fixture on local television and radio broadcasts for over twenty years.” Complaint para. 7. Entercom is described in the Complaint, and is admitted in its Answer, to be “one of the largest radio broadcasting companies in the United States.” Complaint para. 12. It is also admitted that “in 1998, Entercom bought radio station WRKO and its sister station, WEEI-850 Boston,” and “(b]y virtue of its purchase of WRKO and WEEI, Entercom became . . . Carr’s employer."
Carr’s job is to perform services as a “talk announcer” on the programs described in the Artist’s Agreement, and in that “capacity ... to provide his customaiy commentaiy, conduct interviews with guests, conduct telephone discussions with listeners, deliver news, and perform such features and other activities and materials” on the programs Entercom designates. The Artist’s Agreement is detailed on many aspects of the arrangement between Carr and En-tercom that are not necessary for the assessment of the present motions. There are, however, portions of the Artist’s Agreement itself, and in what is described as STANDARD TERMS AND CONDITIONS, which contain provisions that are of significance.[2] They read, in material part, as follows:
In the Artist’s Agreement:
Schedule D. Term of Contract The term of this contract will be the period commencing on September 20, 2003 and ending on and including September 19, 2007. Notwithstanding the foregoing, [En-tercom] shall have the right to continue this Agreement in accordance with the terms provided herein, for one additional period of one (1) year though September 19, 2008, exercisable at [Entercom’s] option by providing Artist[3] with written notice on or before March 19, 2007 (“Renewal Option”).
In the Standard Terms and Conditions:
II.B. Without limiting the generality of the foregoing, Artist acknowledges that [Entercom] has the following exclusive rights:
*****
4. To Artist’s services during the Term hereof; in the field of radio without limitation as to location, and in the field of television within Station’s “city-grade” coverage contour (the “Exclusive Territoiy”), it being further specifically understood that Artist will not so long as this Agreement shall continue in effect and for a period of ninety (90) days thereafter, without the Company’s prior approval, appear, promote, or perform services as described hereunder on any program or any commercial announcement whatsoever which is broadcast or exhibited on any radio or television station, or on behalf of such station, other than Station hereunder, whose city grade coverage contour lies within the Exclusive Territoiy.
*****
VIII. THE COMPANY’S RIGHT OF FIRST REFUSAL
If Artist shall receive at any time during the Term hereof or within one hundred eighty (180) days after the expiration or earlier termination of this Agreement, any offer for Artist’s services from any other radio or television station within the Exclusive Ter-ritoiy to commence after the expiration or earlier termination of this Agreement on any specified compensation arrangement for any specified period, and if Artist shall be ready and willing to accept such offer, then Artist shall give the Company prompt written notice thereof, including a written copy of such offer as presented to the Artist containing the proposed compensation arrangement and term of employment. The Company shall thereupon have the right of first refusal to continue Artist’s services on Station herein provided after the expiration or earlier termination hereof upon the compensation arrangement and term of employment offered by the other station; and the Company shall exercise such right of first refusal by giving Artist written notice that it is doing so no later than seventy-two (72) hours (excluding any intervening Saturday, Sunday or holiday) after receipt by the Company of Artist’s notice . . .
*****
X. MISCELLANEOUS
*****
*140 G. A judicial determination of the invalidity or unenforceability of any provision of this Agreement shall not affect the remaining provisions of this Agreement which shall continue in full force and effect.
H. No person has an authority to make any representation or promise on behalf of either party not contained herein, and this Agreement has not been executed in reliance on any such representation or promise not contained herein.
*****
J. This Agreement shall be construed and governed in accordance with the laws of the Commonwealth of Massachusetts.
_M. This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements, understandings and arrangements, oral or written, between the parties with respect to the subject matter hereof.
On July 9, 2007, Cary L. Pahigian, Carr’s agent, delivered a letter to Entercom, stated to be "(pjursuant to Section VIII of Mr. Carr’s employment agreement with Entercom,” “providing notice of. . . Carr’s intention to accept Greater Boston Radio’s offer of employment.” Included was a copy of a July 9, 2007 letter (the “GBR Offer Letter”), addressed to Carr, in care of his attorney. Copies of both the July 9, 2007 letter to Entercom and the July 9, 2007 letter to Carr are attached as Exhibit 1 to the Affidavit of Katherine O. Coughlin, Esq., Paper #16.
The GBR Offer Letter tenders employment to Carr, on three conditions, “as morning show host on 96.9 WTKK-FM” in Boston. The three conditions to the GBR Offer Letter are: (1) that Carr does “not receive a matching or better offer from [his] current employer, Entercom Boston, LLC . . . within the time frame specified in your Artist’s Agreement with Entercom; (2) Entercom agrees, in writing, to waive any and all rights it may have under paragraphs 11(B)(4) (non-competition covenant) and VIII (right of first refusal) of your Artist’s Agreement with Entercom; or (3) you receive a declaration or ruling from a court of competent jurisdiction that paragraphs 11(B) (4) and VIII of your Artist’s Agreement with Entercom are unenforceable or otherwise do not prevent you from accepting this offer.”
Also on July 9, 2007, Entercom’s counsel advised Carr’s counsel, by letter and facsimile, among other things, that “Entercom hereby expressly exercises its right of first refusal to continue . . . Carr’s services after September 19, 2007 as provided in his current Employment Agreement — with the only caveat being that. . . Carr’s compensation arrangement and term of employment shall be that set forth in the July 9, 2007 Offer Letter from Greater Boston Radio, Inc.”
This is the factual posture in which the three motions are before the Court.

DISCUSSION

Initially, the Court reviews Entercom’s Cross-Motion to Stay Decision on That Portion of The Motion for Judgment on the Pleadings Related to the Right to Match, Paper #18. The Court declines to stay its action given the determinations reached below.
The Court next sets forth a brief recitation of the requirements of Mass. R. Civ. P. Rule 12(c), underwhich Carr proceeds, and Mass.R.Civ.P. Rule 56, under which Entercom proceeds.
Carr’s Rule 12(c) motion admits all well-pleaded allegations of Entercom’s Answer and its Counterclaim,[4] and the Court must accept as true such inferences as may be drawn in Entercom’s favor. Sampson v. Lynn, 405 Mass. 29, 30 ((1989); Natick Auto Sales, Inc. v. Department of Procurement and General Services, 47 Mass.App.Ct. 625, 630 (1999). The Rule is designed to cover the rare case where the Answer and, as here, the Counterclaim, admits all the material allegations of the Complaint so that no material issue of fact remains for adjudication. Mass.R.Civ.P. Rule 12(c), Reporter’s Notes. “If the [non-movant] pleads by denial or by affirmative defense so as to put in question a material allegation of the complaint, judgment on the pleadings is not appropriate.” Tanner v. Board of Appeals of Belmont, 27 Mass.App.Ct. 1181, 1182 (1989). Of course, conclusions of law from the facts alleged are open for review on a Rule 12(c) motion.
The Answer and Counterclaim for declaratory relief here, however, are sufficient unless they show beyond doubt that no provable set of facts would entitle Entercom to relief. Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66, 68 (1992). Entercom bears a “relatively light burden,” Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998), and must be given the benefit of any doubts. Kipp v. Keuker, 7 Mass.App.Ct. 206, 210 (1979). These are “generous principles” and the Court will apply them in the way they are intended. Connerty v. Metropolitan District Commission, 398 Mass. 140, 143 (1986).
Entercom moves pursuant to Rule 56.
Rule 56(c) of the Massachusetts Rules of Civil Procedure, 365 Mass. 824 (1974), provides that summary judgment is appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” We view the evidence in the light most favorable to the nonmov-ing party. See BayBank v. Bornhofft, 427 Mass. 571, 573 (1998).
Vittands v. Sudduth, 49 Mass.App.Ct. 401, 405-06 (2000).
*141 Thus, summary judgment is granted where, viewing the evidence in the light most favorable to Carr, the non-moving party, there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Cabot Corporation v. AVX Corporation, 448 Mass. 629, 636-37 (2007); Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). Entercom, as “[t]he moving party must establish that there are no genuine issues of material fact, and that [Carr] has no reasonable expectation of proving an essential element of [his] case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
While we examine the record in its light most favorable to the nonmoving party, Foster v. Group Health Inc., 444 Mass. 668, 672 (2005), “[c]onclus-ory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment” (citations omitted). Cullen Enters., Inc. v. Massachusetts Prop. Ins. Underwriting Ass’n, 399 Mass. 886, 890 (1987). “If the opposing party fails properly to present specific facts establishing a genuine, triable issue, summary judgment should be granted.” Id.
O’Rourke v. Hunter, 446 Mass. 814, 821-22 (2006).
“ ‘[T]he party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if [it] demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.’ Wheatley v. American Tel & Tel. Co., 418 Mass. 394, 397 (1994), quoting Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1994).” Symmons v. O’Keefe, 419 Mass. 288, 293 (1995). See also DiPietro v. Sipex Corp., 69 Mass.App.Ct. 29, 36 (2007).
Before stating its conclusions, this Court pauses to observe that the parties in this case are extremely sophisticated, all certainly had constant advice and assistance from highly competent counsel and agents, and all benefitted from their extensive experience in the broadcast industry. These sophisticated parties negotiated and chose specific language to state their intentions in the June 3, 2002 Artist’s Agreement. Here, there was no disparity in bargaining power or lack of sophistication about the matter at hand. “Where knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document. . . they are entitled to and should be held to the language they chose.” Cabot Corporation, 448 Mass. at 638.
The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four comers of the instrument that are specifically anticipated and addressed therein overwhelm or change the document itself. “ [Agreements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). “It is not the role of the court to alter the parties’ agreement.” Rogaris v. Albert, 431 Mass. 833, 835 (2000). Nor is this a time for the Court to attempt to be smarter than the parties.
Part of what is involved here is the interpretation of portions of the Artist’s Agreement. The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language generally must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contractual provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., 426 Mass. at 381. The mere fact that parties disagree on the proper construction of contract language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“The object of the court is to construe the [Agreement] as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the Artist’s Agreement as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v. George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
This Court does not find either of the two principal provisions of the Artist’s Agreement involved here, Sections II.B.4 and VIII, to be ambiguous. Section II.B.4 is a form of non-competition covenant; Section VIII is, at least as applied here, a form of right of first refusal.
What requires a more extended examination is the effect of the statutory constraint in G.L.c. 149, §186. This Court must examine G.L.c. 149, §186 utilizing the general guideposts for statutory interpretation.
Statutory interpretation is a quintessential judicial responsibility, to be undertaken using well-established guiding principles.
In a recent case, the Supreme Judicial Court summarized the fundamental precepts of statutory in *142 terpretation as follows: “[A] statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” . . . Courts must ascertain the intent of a statute from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense . . .
DiGiacomo v. Metropolitan Property & Cos. Ins. Co., 66 Mass.App.Ct. 343, 346 (2006).
A statute should not be “unduly constricted so as to exclude matters fairly within [its] scope.” Brittle v. City of Boston, 439 Mass. 580, 585 (2003). At the same time, a Court should interpret a statute according to its plain words; it “may not add words . . . that the Legislature did not put there.”
Carmel Credit Union v. Bondeson, 55 Mass.App.Ct. 557, 560 (2002).
When “two readings of a statute are possible,” however, the Supreme Judicial Court — and this Court, as well — "chooses the reading that best comports with the statute’s apparent intent and purpose, and [it rejects] a reading that would hobble the statute’s effectiveness." Lindsay v. Department of Social Services, 439 Mass. 789, 796 (2003). In short, “[i]f a liberal, even if not literally exact, interpretation of certain words is necessary to accomplish the purpose indicated by the words as a whole, such interpretation is to be adopted rather than one which will defeat the purpose.” North Shore Realty Trust v. Commonwealth, 434 Mass. 109, 112 (2001), quoting Champigny v. Commonwealth, 422 Mass. 249, 251 (1996).
The Court begins with the statutoiy language.
Any contract or agreement which creates or establishes the terms of employment for an employee or individual in the broadcasting industry, including, television stations, television networks, radio stations, radio networks, or any entities affiliated with the foregoing, and which restricts the right of such employee or individual to obtain employment in a specified geographic area for a specified period of time after termination of employment of the employee by the employer or by termination of the employment relationship by mutual agreement of the employer and the employee or by termination of the employment relationship by the expiration of the contract or agreement, shall be void and unenforceable with respect to such provision. Whoever violates the provisions of this section shall be liable for reasonable attorneys fees and costs associated with litigation of an affected employee or individual.
This statute was enacted in 1998, and this Court has not been cited to, nor has it found, any appellate, or even trial court, interpretation thereof. The Court, therefore, writes here on a tabula rasa.
It is quite apparent that this statute is designed to protect employees in. the broadcast industry from non-competition covenants in their employment agreements. Some limited statutoiy history suggests that the reasoning behind the law is the substantial imbalance in bargaining power between employers and employees in this industry, resulting from the concentration of ownership of broadcasting companies. Apparently, it is almost a certainly that an employee may be forced totally out of his employment by such non-competition covenants because so few broadcast companies exist, and those that do control and compete in such widespread markets. Whatever, it is not for this Court to assay the rationale for the law; it is enough to say that it is not irrational, and Entercom does not argue that it is.
It is clear, therefore, that Section II.B.4 of the Artist’s Agreement runs afoul of G.L.c. 149, §186. That being said, however, the Court is not being asked, at this time, by Entercom to enforce that part of the Artist’s Agreement. Nevertheless, a party need not run the risk of enforcement before he can challenge by declaratory judgment what may be an illegal provision.
It is not necessary that the parties be irrevocably bound to a course of action before a court can afford declaratory relief. See, e.g., LaCouture v. Retirement Bd. of Quincy, 11 Mass.App.Ct. 738, 744-45 (1981) (plaintiff was not obliged to retire before ascertaining by declaratory judgment what his pension would be).
Town of Oxford v. Oxford Water Co., 391 Mass. 581, 585 (1984).
The purpose of a declaratory judgment action is “to remove, and to afford relief from, uncertainty and insecurity with respect to rights, duties, status and other legal relations, and it is to be liberally construed and administered.” G.L.c. 231 A, §9. See Kilroy v. O’Connor, 324 Mass. 238, 242 (1949) (relief in nature of declaratory judgment designed to settle completely controversy submitted for determination). General Laws c. 231 A, §8, states that “(w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.” An action for declaratory relief will preempt future litigation among the affected parties by resolving any uncertainties about their rights and obligations. See School Comm. of Cambridge v. Superintendent of Schs. of Cambridge, 320 Mass. 516, 518 (1946); Board of Appeals of Rockport v. DeCarolis, 32 Mass.App.Ct. 348, 353, (1992).
Patterson v. Paul, 448 Mass. 658, 668 (2007).
*143 Thus, this Court can, and will, make a declaration regarding the lack of enforceability of Section II.B.4 of the Artist’s Agreement.
The Court turns next to Sec. VIII of the Artist’s Agreement. Here the question for decision is whether that section violates G.L.c. 149, §186. In other words, does Sec. VIII create or establish terms of employment for Carr — clearly an employee in the broadcasting industry — which restrict his right to obtain employment in a specified geographic area for a specified period of time after termination of his Artist’s Agreement? To answer this question, the Court observes that a portion of the language of Sec. VIII may violate G.L.c. 149, §186, and a portion thereof may not. What this Court’s ruling depends upon is the timing of the application of Sec. VIII.
If, as here, Carr’s employment with Entercom has not terminated, for any reason, then the application of Sec. VIII is no more of a limitation on his competition than any other provision in the Artist’s Agreement, such as the Renewal Option which, if exercised, “continues” the termination beyond September 19, 2007 to September 19, 2008.[5] On the other hand, if Sec. VIII was being imposed after the September 19, 2007 termination, rather than before as here, then its language would seem to violate c. 149, §186 because the exercise of the right of first refusal would then occur “within one hundred eighty (180) days after the expiration or earlier termination of this Agreement.” In the latter circumstance, the enforcement of Sec. VIII might be construed as a restriction on competition.
Can Sec. VIII be parsed and segregated in this fashion? This Court believes that it can, and it should. It refers to Sec. X.G of the Artist’s Agreement, quoted above, which provides that “[a] judicial determination of the invalidity or unenforceability of any provision of this Agreement shall not affect the remaining provisions of this Agreement which shall continue in full force and effect.” This language is what the sophisticated parties to the Artist’s Agreement chose, and it must be given meaning.
The Massachusetts common law relating to covenants not to compete was recently stated as follows:
A covenant not to compete is enforceable only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest. See Marine Contrs. Co., v. Hurley, 365 Mass. 280, 287-88 (1974); All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974). Covenants not to compete are valid if they are reasonable in light of the facts in each case. See Marine Contrs. Co. v. Hurley, supra, at 287; Saltman v. Smith, 313 Mass. 135, 145 (1943). Historically, covenants not to compete typically have arisen in either the employment context or in the context of the sale of a business. See, e.g., Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85 (1979) (sale of business); Marine Contrs. Co. v. Hurley, supra (employment); All Stainless, Inc. v. Colby, supra, (employment); Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488 (1986) (sale of business) . . . [C]ourts consider whether “the parties entered into the agreement with the assistance of counsel and without compulsion (an element frequently not present in the employer-employee context).” Wells v. Wells, supra at 324-25, and cases cited . . .
Boulanger v. Dunkin’ Donuts Incorporated, 442 Mass. 635, 639-40 (2004).
Legitimate business interests include protection of trade secrets, confidential information, and good will. Marine Contrs. Co. v. Hurley, supra at 287. A covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest.
Id. at 641.
The Court feels certain that the parties here, or at least their counsel, are aware of the decision in another radio talk show announcer’s case, Richmond Brothers, Inc. v. Westinghouse Broadcasting Co., Inc., 357 Mass. 106 (1970), that frowns upon non-competition covenants that protect only “ordinary competition.” Id. at 111.
The foregoing, however, deals with the application of the common law to covenants not to compete. Here, the Court is dealing with a specific statutory prohibition. As noted above, G.L.c. 149, §186 has yet to be interpreted. That being the situation, this Court has examined the Supreme Judicial Court’s opinion in Falmouth Ob-Gyn Associates, Inc. v. Abisla, 417 Mass. 176 (1994), which assays a similar statutory limitation on non-competition agreements that relates to physicians. In Abisla the SJC broadly construed the statutory language in favor of Dr. Abisla. The SJC particularly focused on the phase “any restriction” in G.L.c. 112, §12X, and found a “compensation for competition” clause to be invalid.
G.L.c. 149, §186 contains somewhat different language. It prohibits any contract “which restricts the right of [an] employee ... to obtain employment in a specified geographic area for a specified period of time after termination of employment of the employee by the employer or by termination of the employment relationship by mutual agreement of the employer and the employee or by termination of the employment relationship by the expiration of the contract or agreement.” As also indicated above, and consistent with the broad reach of Abisla, this Court would find that if the right of first refusal in Sec. VIII was exercised in the period “within one hundred eighty (180) days after the expiration or earlier termination of [the Artist’s] Agreement,” it would be barred by the statute. That, however, is not what occurred here.
The Artist’s Agreement still has not been terminated by Entercom, or by mutual agreement of Entercom and Carr, or by the expiration of the Agreement itself. *144 Rather, Carr, following the requirement of Sec. VIII, “[gave Entercom] . . . written notice [of the Greater Boston Radio offer of employment], including a written copy of such offer as presented to [Carr] containing the proposed compensation arrangement and term of employment.” Entercom “thereupon . . . [exercised its] right of first refusal by giving [Carr] written notice that it [was] doing so no later than seventy-two (72) hours (excluding any intervening Saturday, Sunday or holiday) after receipt by [Entercom of Carr’s] notice.” This all happened no later than July 10, 2007, a time when the Artist’s Agreement was still fully operative, albeit for only about two more months. That exercise continued the Artist’s Agreement in effect well beyond September 19, 2007. And it is not a “post-employment” restriction.
G.L.c. 149, §186 is a statute in derogation of the common law which usually must be construed strictly. Abisla, 417 Mass. at 179. At the same time, “the construction adopted should advance, rather than defeat, the purpose of the Legislature.” Id., quoting from Vallin v. Bondesson, 346 Mass. 748, 753 (1964). Still further, “[t]his court may not read into a statute a provision which the Legislature has omitted, whether the omission is deliberate or inadvertent. Sterilite Corp. v. Continental Casualty Co., 397 Mass. 837, 839 n.3 (1986).” Abisla, 417 Mass. at 181 n.6.
For Carr to receive protection under G.L.c. 149, §186 in the circumstances presented here would require this Court to ignore the fact that his Artist’s Agreement has not terminated, as is required by the wording of the statute, and to presume that the statute includes broad language, like the “any restriction” language in Abisla, which it does not.
This conclusion and ruling does not defeat the purpose of the Legislature in enacting G.L.c. 149, §186. Carr could have quietly, even secretly, met with Greater Boston Radio, Inc. and discussed or negotiated his future with it while his Artist’s Agreement was still operative. See, e.g., Meehan v. Shaughnessy; Cohen, 404 Mass. 419, 435 (1989), wherein the SJC discussed the acceptability to it of partners in a law firm, despite their fiduciary duties, “secretly setting up a new firm during their tenure” at their old firm. What Carr could not do is what he did here: receive and accept an offer from Greater Boston Radio, Inc. before his Artist’s Agreement had terminated.
The Court is aware that Carr claims that he cannot be forced to work for WRKO. He cites to McCormick v. The Proprietors of Cemetery of Mt. Auburn, 285 Mass. 548 (1934), and Rice v. D'Arville, 162 Mass. 559, 560 (1895). Carr might also have cited a famous English case, Lord Chancellor St. Leonards’s decision in Lumley v. Wagner, 1 DeG., M.&G., 604 (1852). In Lumley, Lord Chancellor St. Leonards discussed — at considerable length — the equitable principles applicable to the indirect enforcement of agreements for personal services, sometimes referred to as negative contracts, and whether, and if so, to what extent injunctive relief might be available.[6] While Carr’s position may have merit, it is not presently before this Court on the three motions in play. In short, it remains for another day, on another record.

ORDER

For the foregoing reasons: Plaintiff Howard L. Carr’s Motion for Judgment on the Pleadings, Paper #11, is ALLOWED in part, and DENIED in part, to the extent that when a final judgment is entered in this case, it will include a declaration to the effect that Section II.B.4 of the Artist’s Agreement in issue is invalid and unenforceable because of the restrictions in G.L.c. 149, §186; Entercom’s Cross-Motion for Partial Summary Judgment, Paper # 15, is ALLOWED in part, and DENIED in part, to the extent that when a final judgment is entered in this case it will include a declaration to the effect that Section VIII of the Artist’s Agreement in issue, as applied in the circumstance described in this Memorandum and Order, is valid and enforceable despite the restrictions in G.L.c. 149, §186; and Entercom’s Cross Motion to Stay Decision on That Portion of the Motion for Judgment on the Pleadings Related to the Right to Match, Paper #18, is DENIED.

Some of these sections are as amended by Schedule F of the Artist’s Agreement.

The Artist’s Agreement refers to Carr as “Artist.”

Although Carr’s motion speaks only to his request for a declaratory judgment in his Complaint, Count IV of Entercom’s Counterclaim also seeks similar declaratory relief.

At oral argument, Carr contended that the effect of Sec. VIII is to create a new contract. This Court disagrees. Sec. VIII uses the same “continue” language as in the Renewal Option. It says that Entercom shall, upon receiving notice of an offer to Carr, “have the right of first refusal to continue Artist’s services on Station herein provided . . . upon the compensation arrangement and term of employment offered by the other station.” (Emphasis added.)

In Lumley, Mile. Johanna Wagner entered into an agreement with Benjamin Lumley, lessee of Her Majesty’s Theatre, Drury Lane, in London, to sing at Drury Lane for three months, beginning April 1, 1852. Mile. Wagner also agreed “not to use her talents at any other theatre . . . without the written authorization of Mr. Lumley.” Despite the foregoing agreement, Mile. Wagner subsequently made another engagement with Frederick Gye in which she, for a larger salary, would sing at the Royal Italian Opera, Covent Garden, in London, and abandon the agreement with Lumley.
The interplay between the impropriety of injunctive relief forcing Mile. Wagner to sing for Benjamin Lumley at Drury Lane and the validity of injunctive relief preventing her from singing for Frederick Gye at Covent Garden is extensively discussed. Much of that learning may eventually have a place here.