Curran, Dennis J., J.
This case arises out of the alleged breach of a commercial lease. A trial without a juiy was held on June 12, 2013. Based on the credible testimonial and documentary evidence, the Court issues the following Findings of Fact and Rulings of Law.
I. AGREED FACTS
The plaintiff Cummings Properties, LLC (“Cummings”) is a Massachusetts limited liability company with a principal place of business at 200 West Cummings Parkin Woburn, Massachusetts. The defendant National Leisure Group, Inc. n/k/a World Travel Hold *275 ings Inc., is a Delaware corporation with corporate offices at 100 Fordham Road in Wilmington, Massachusetts.
Cummings and National Leisure were parties to two commercial leases for premises at 100 Sylvan Road in Woburn, Massachusetts: the “1996 lease” and the “2000 lease.”
The 1996 Lease
In 1996, Cummings Properties Management, Inc. (Cummings’s predecessor-in-interest) entered into a commercial lease (the “1996 lease”) with National Leisure. The initial term of the 1996 lease was five years, from December 1, 1996 through November 30, 2001. By a lease extension dated June 21, 2001, the term of the 1996 lease was extended for an additional eight years, ending on November 30, 2009 at noon.
The parties to the 1996 lease entered into four amendments to the lease, the last of which (executed on or about February 5, 2002), increased the total amount of space leased by National Leisure to about 42,042 square feet of indoor building space and 540 square feet of outdoor space at 100 Sylvan Road in Woburn, Massachusetts.
The premises that were the subject of the 1996 lease (as amended and extended) included Suites 600, P-800 and P-900 at 100 Sylvan Road.
Section 22 of the 1996 lease, entitled “Occupancy,” provided, in relevant part, that:
[i]n the event that [National Leisure] continues to occupy or control all or any part of the leased premises after the agreed termination of this lease without the written permission of [Cummings], then [National Leisure] shall be liable to [Cummings] for any and all loss, damages or expenses incurred by [Cummings], and all other terms of this lease shall continue to apply except that rent shall be due in full monthly installments at a rate of one hundred fifty (150) percent of that which would otherwise be due under this lease, it being understood between the parties that such extended occupancy is as a tenant at sufferance and is solely for the benefit and convenience of [National Leisure] and as such has a greater rental value. [National Leisure’s] control or occupancy of all or any part of the leased premises beyond noon on the last day of any monthly rental period shall constitute [its] occupancy for an entire additional month, and increased rent as provided in this section shall be due and payable immediately in advance.
The 1996 lease and the extensions and/or amendments thereto were negotiated between Cummings and National Leisure, each of which was, and is, a sophisticated commercial entity.
Section 27 of the 1996 lease provided, inter alia, that National Leisure: (i) “shall at the termination of this lease remove all of [its] goods and effects from the leased premises,” (ii) “shall deliver to [Cummings] the leased premises and all keys and locks thereto,” (iii) shall deliver the leased premises “in the same condition as they were at the commencement of th[e] lease,” and (iv) “in the event of [its] failure to remove any of [its] property from the leased premises upon termination of the lease, [Cummings] is authorized, without liability to [National Leisure] for loss or damage thereto, and at the sole risk of [National Leisure], to remove and store any such property at [National Leisure’s] expense, or to retain same under [Cummings’s] control, or to sell at public or private sale (without notice), any or all of the property so removed and to apply the net proceeds of such sale to the payment of any sum due hereunder, or to destroy such abandoned property.”
Section 1 of the 1996 lease provided that the rent was subject to annual adjustment based upon the change, if any, in the cost of living as shown by the Consumer Price Index.
The 2000 Lease
In 2000, Cummings entered into another commercial lease (the “2000 lease”) with National Leisure. The initial term of the 2000 lease was one year and six months, from August 1, 2000 through January 31, 2002. By a lease extension dated June 12, 2001, the term of the 2000 lease was extended for an additional seven years and ten months, ending on November 30, 2009 at noon.
The premises that were the subject of the 2000 lease included Suite G-600 at 100 Sylvan Road, Woburn, Massachusetts, consisting of about 15,999 square feet of office space.
Section 22 of the 2000 lease, entitled “Occupancy,” provided, in relevant part:
[i]n the event that [National Leisure] continues to occupy or control all or any part of the leased premises after the agreed termination of this lease without the written permission of [Cummings], [it] shall be liable to [Cummings] for any and all loss, damages or expenses incurred by [Cummings], and all other terms of this lease shall continue to apply, except that use and occupancy payments shall be due in full monthly installments at a rate of 150 percent of the monthly rent due under this lease immediately prior to termination or at [Cummings’s] then current published rent for the leased premises, whichever is greater, it being understood that such extended occupancy is a tenancy at sufferance, solely for the benefit and convenience of [National Leisure] and of greater rental value. [National Leisure’s] control or occupancy of all or any part of the leased premises beyond noon on the last day of any monthly rental period shall constitute [its] occupancy for an entire additional month, and increased rent as provided in this section shall be due and payable immediately in advance.
*276 The 2000 lease and its extension were negotiated between Cummings and National Leisure, each of which was, and is, a sophisticated commercial entity.
Section 27 of the 2000 lease provides, inter alia, that National Leisure: (i) “shall at the termination of this lease remove all of [its] goods and effects from the leased premises,” (ii) “shall deliver to [Cummings] the leased premises and all keys and locks thereto,” (iii) shall deliver the leased premises “in the same condition as they were at the commencement of th[e] lease,” and (iv) “(a]ny of [its] property that remains in the leased premises upon termination of the lease shall be deemed abandoned and shall be disposed of as [Cummings] sees fit, with no liability to [National Leisure] for loss or damage thereto, and at the sole risk of [it]. [Cummings] may remove and store any such property at [National Leisure’s] expense; retain same under [Cummings’s] control; sell same at public or private sale (without notice) and apply the net proceeds of such sale to the payment of any sum due hereunder; or destroy same.” (Emphasis added.)
Section 1 of the 2000 lease provided that the rent payable in connection with the lease was subject to annual adjustment based upon the change, if any, in the cost of living as shown by the Consumer Price Index.
The End of the Lease Term
The 1996 lease (as amended and extended) and the 2000 lease (as extended) were scheduled to terminate on November 30, 2009 at 12 pm.
The electrical contractor hired by National Leisure performed work in the leased premises after that date and time, and continued to perform the work requested by National Leisure on the premises through December 2, 2009.
National Leisure failed to return the keys to the premises to Cummings by the agreed-upon date and time, as required in both the 1996 and 2000 leases, and a pool table belonging to National Leisure remained in the premises after the lease terminated until it was removed on December 2, 2009.
National Leisure has refused to pay Cummings the $226,079.27 claimed as holdover rent or expenses under either lease for December 2009.
II. FINDINGS AS TO DISPUTED FACTS[1]
Both Cummings and National Leisure were sophisticated commercial entities, and the 1996 and 2000 leases (and extensions and amendments thereto) were agreements negotiated at arms-length for a significant quantum of office space at 100 Sylvan Road in Wo-burn, Massachusetts. Those commercial agreements included many provisions setting forth each party’s obligations concerning occupancy and surrender, and detailed National Leisure’s obligations to timely vacate the premises upon the lease’s termination. The lease also set forth the consequences of any failure by National Leisure to vacate the premises as and when required.
National Leisure was required to vacate the premises completely on November 30, 2009 at noon. It was aware of the significance of that legal deadline. On March 13, 2009, National Leisure confirmed in writing that it “shall vacate the premises on or before the lease expiration date of November 30, 2009.” From that date, National Leisure had more than eight full months to ensure that it fully vacated the leased premises. Indeed, Cummings wrote to National Leisure on September 8, 2009—more than two months before the November 30, 2009 lease termination date—to remind it of the serious consequences that would stem from its failure to timely perform its lease obligations. Specifically, Cummings notified National Leisure that;
we cannot over-emphasize the importance of completely vacating the leased premises on or before the last day of your tenancy as specified in your leases . . . Any such holding over not sanctioned by Cummings will result in sharply increased rental payments . . .
Although it was not obligated under the lease to do so, Cummings also invited National Leisure, in its September 8, 2009 memorandum, to schedule a walk-through of the leased premises to clarify National Leisure’s obligations under the leases. National Leisure waited until just days before the November 30, 2009 deadline before accepting Cummings’s offer.
During the November 20, 2009 walk-through, Cummings identified a number of items that National Leisure was responsible to resolve/repair before the termination deadline, including (i) removing its personal property from the premises; (ii) properly disposing of trash and other items that had been strewn haphazardly in the premises and not deposited in the dumpster and trash compactors; (iii) its need to make arrangements to replace dozens of burned-out lights serving the premises; (iv) properly terminating electrical lines throughout the premises; (v) labeling wiring that was suspended from the ceiling in at least a dozen locations inside the premises; and (vi). repairing exposed electrical outlets in violation of the Massachusetts electrical code.
On November 24, 2009—following a telephone conversation in which Cummings reminded National Leisure of the consequences of a lease holdover, which had been previously identified during the walk-through—Cummings memorialized in writing National Leisure’s numerous unresolved issues that needed to be addressed “prior to [its] lease termination date.” National Leisure responded the next day, and confirmed that it would address the electrical issues itself before November 30. National Leisure failed to do so. Instead, at 5:26 PM on November 30, National Leisure notified Cummings in an email that:
I spoke to [an electrician hired by National Leisure to work in the leased premises] and he is working *277 on the electrical in our suite to make it safe. He is staying late and hopes to finish, in the event he doesn’t he will be back first thing in the morning to complete the work.
National Leisure further informed Cummings that it continued to hold the keys to the premises and that it would return those keys to Cummings by express mail when it no longer needed them. Moreover, at the time of the November 30 communication, National Leisure’s personal property continued to remain at the premises.
For at least two days after National Leisure’s November 30 post-lease-termination communication, its contractors continued to occupy and work on the leased premises. Tools and equipment belonging to National Leisure’s agents, as well as its personal property remained in the premises through those dates (i.e., December 1 and December 2, 2009). Cummings did not receive the keys to the premises from National Leisure until December 2.
At trial, credible testimony was offered by Cummings—and indeed by witnesses called by National Leisure itself—of the mess it left when the lease ended. There were a “tremendous amount of wires coming down from the ceilings and out of the walls,” “live” electrical outlets and wires, a “fair amount of trash,” “universal power supply” systems strewn about, “all kinds of file cabinets,” “desks,” “chairs,” “cubicles” and all kinds of data equipment. In addition to the two electricians National Leisure had engaged and threw into the mix, it took ten Cummings workers to clean out the premises.
Indeed, National Leisure called an electrician as its own witness at trial who candidly, and devastatingly, testified that National Leisure had abandoned over 100,000 feet of cabling, some of which was hanging from the ceilings, and all of which had to be pulled out, cutup and disposed of off-premises. He admitted that National Leisure left the premises “unsafe,” due to “hot” electrical wires (i.e., “hot whips”). His testimony was forthright; I find him credible on these issues.
National Leisure’s failure to completely vacate the premises as and when required by the leases is clear, and the consequences that must flow from its breach are spelled out by the commercial leases executed by these two commercially-sophisticated business entities. National Leisure agreed that its failure to timely vacate would obligate it to pay a full month’s use and occupancy charge at an agreed-upon rate of 150 percent of the monthly rate. Despite written demand, it failed to pay any amount to Cummings for its occupancy and encumbrance of, and its holdover at the premises, nor has it paid certain outstanding trash invoices, real estate tax invoices, water and sewer invoices, and invoices for damage to the premises. It is liable in full, as it had agreed for these amounts owed.[2]
HI. FINDINGS OF FACT AS TO THOSE PROPOSED BY THE DEFENDANT NATIONAL LEISURE
ALLOWED as to the defendant National Leisure’s proposed findings of fact numbered 1, 2, 4, 6, 7, 8, 9, 10, 12, 18, 21, 24, 31, 35, 37 and 38.
DENIED as to National Leisure’s proposed findings of fact numbered 3, 5, 11, 13, 14, 15, 16, 17, 19, 20, 22, 23, 25, 26, 27, 28, 29, 30, 32, 33, 34, 36 and 39.
DISCUSSION
A court must give effect to the parties’ intention and construe the language to give it reasonable meaning whenever possible. Massachusetts Turnpike Authority v. Perini Corp., 349 Mass. 448, 452 (1965); New York, N.H.&H.R.R. v. Walworth Co., 340 Mass. 1, 3 (1959). Consequently, “(c)ontract interpretation is largely an individualized process with the conclusion in a particular case turning upon the particular language used against the background of other indicia of the parties’ intention.” Starr v. Fordham, 420 Mass. 178, 190 (1995). “Where knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document . . . they are entitled to and should be held to the language they chose.” Cabot Corp. v. AVX Corp., 448 Mass. 629, 638 (2007); Louis Stoico, Inc. v. Colonial Dev. Corp., 369 Mass. 898, 902 (1976).
In this case, sophisticated parties agreed upon terms and conditions of their rights and responsibilities when the tenant National Leisure would vacate the leased premises. The credible evidence at trial established that it continued to occupy and control the premises after the lease ended. There is no way it would not have understood the consequences that would flow from its failure to comply with this contract term. Perhaps it misapprehended the seriousness of Cummings’ purpose; but that is a problem of its own making. National Leisure’s casual attitude toward its contract responsibility is its own fault; its email to Cummings—sent after the lease was terminated—admitted that its contractors continued to work in the premises “to make [it] safe” and might continue working the next day (which they did). National Leisure also admitted that it still held the keys to the premises.
These leases were negotiated documents. Indeed, the original lease at section 22 contains hand-written interlineations indicating the special attention the parties devoted to their construction. As the Supreme Judicial Court has declared:
[T]he parties to these negotiated contracts were not unsophisticated and there is no suggestion that the plaintiffs were not represented by counsel. Indeed, the plaintiffs entered into these contracts with their eyes wide open ... In these circumstances, where sophisticated parties choose to embody their agreement in a carefully crafted document, they are entitled to and should be held to the language they choose.
*278 Anderson Street Associates v. City of Boston, 442 Mass. 812, 819 (2004).
We cannot simply re-write the contract to which these commercially-sophisticated parties freely agreed. See Anderson Street Assocs. v. City of Boston, 442 Mass. 812, 818 (2004); Carr v. Entercom Boston, 23 Mass. L. Rptr. 138 (Suff.Super.Ct, Sept. 19, 2007) (Van Gestel, J.). See also Rogaris v. Albert, 431 Mass. 833, 835 (2000); Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).
Section 22 establishes that in the event of holdover, National Leisure was liable—in addition to holdover payments—for taxes, utility and water and sewer charges. This was not a liquidated damages provision; rather, it established the rental rate to be paid in the event that the tenant failed to timely vacate the premises at the end of the lease term. See 1996 Lease at §22 (in the event of holdover, “rent shall be due in full monthly installments at a rate of one hundred fifty (150) percent of that which would otherwise be due under this lease, it being understood between the parties that such extended occupancy is as a tenant at sufferance and is solely for the benefit and convenience of [National Leisure] and as such has a greater rental value”). The parties knew and were familiar with, the concept of a true “liquidated damages” provision because, by comparison, section 20 used that phrase to describe Cummings’s remedy in the event of a substantial financial default by National Leisure.
Section 22 contemplated the possibility that holdover may continue for many months, and that holdover rental payments would be payable—like “typical” rent in Section 1—on or before the first of each successive month of holdover.[3] Compare NPS, LLC v. Minihane, 451 Mass. 417 (2008) (analyzing and upholding a liquidated damages provision that allowed New England Patriots to accelerate nine years worth of future license fees into a single lump sum when a season ticket holder breached after one year of a ten-year contract); Cummings Properties, LLC v. National Communications Corp., 449 Mass. 490 (2007) (upholding a rent acceleration clause by which all future payments would immediately become due and payable as a single lump sum in the event of a financial default by tenant). Section 22 established the base rental rate that the parties agreed National Leisure would be required to pay in the event of a holdover.
National Leisure now attempts to argue that the duration of its holdover was only a matter of a few days beyond the deadline and that the imposition of a full month’s charge at the 150 percent rate as set forth in Section 22 would be unreasonable. But this argument contravenes the principle that:
[in assessing reasonableness, we look to the circumstance at the time of contract formation; we do not take a “second look” at the actual damages after the contract has been breached.
Minihane, 451 Mass, at 421 (emphasis supplied).
At the time of the making of these leases, National Leisure was free to accept or reject this contract term; it chose to accept it. It cannot now be heard to complain about the consequences of the exercise of its own choice. In summary, National Leisure cannot sustain its burden of showing that the “the damages to which it agreed [at the time of contracting] are disproportionate to a reasonable estimate of those actual damages likely to result from a breach.” Cummings, 449 Mass, at 494-95.
ORDERAND JUDGMENT
For these reasons, judgment shall enter forthwith for the plaintiff Cummings Properties, LLC on counts I and II of the complaint, and an award shall enter in its behalf against National Leisure Group, Inc. for its use and occupancy charge of $226,079.27 for Cummings’s property for December 2009 as provided in section 22 of the lease, plus $16,813.91 representing invoices issued by Cummings Properties, LLC to National Leisure, also in accordance with the leases.
Further, interest shall be added to the damages awards of $226,079.27 and $16,813.91, detailed above, at the contractually-agreed upon rate of 18% per annum, from the date of breach, which I find to be December 2, 2009.
APPENDIX A
As an example of the damages to the premises caused by the defendant National Leisure, this Court finds credible, at a minimum, the following;
Description of Damage Cost to Repair
Trash removal $1,747.20
(See Trial Exhibit 27)
Trash removal 686.40
(See Trial Exhibit 28)
Damage to wall 279
Terminate plumbing due to removing refrigeration 185
Debris removal 80
Replace ceiling tiles and remove 35 non-conforming can lights 1,400
Remove non-conforming light switches 119
Repair broken glass on window 160
Replace 3,577 square feet of damaged carpeting 3,577
(See Trial Exhibits 31 and 32) Light bulb replacement 2,086
Office restoration work in Suite G600 (see Trial Exhibit 15, previously deducted from the security deposit) 5.216

The Court reserves the right to issue additional Findings.

he Court appends a detailed list of the damages to the premises upon which credible evidence was put forth at trial. (See Appendix “A.”)

Indeed, section 22 obligates a lessee to pay, in addition to the holdover charge, any other “loss, damages or expenses incurred by [Cummings]” as a result of the holdover—which necessarily is not a sum certain at the time the lease was executed.